# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROCHELLE MCINTOSH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 11 C 7094 |
| HSBC BANK USA, N.A., | ) ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rochelle McIntosh ("McIntosh") brought suit against HSBC Bank USA, N.A. ("HSBC") as the owner of her apartment building, alleging that HSBC failed to maintain heat or hot water at the premises from the time it assumed possession in October 2010 through April 21, 2011. That suit was removed from Cook County Circuit Court to this court in October 2011 on the basis of diversity jurisdiction. McIntosh now seeks leave to amend her complaint to add additional parties, one of which is non-diverse, and asks that I remand this case back to the Cook County Circuit Court. For the reasons explained below, the motion is granted.

I.

According to the allegations of her proposed Third Amended Complaint ("TAC") (Dkt. No. 20-5), McIntosh was a tenant at 1643 W. Marquette Road, of which HSBC became the legal owner pursuant

to an order of possession entered by the Cook County Circuit Court on Oct. 20, 2010. (TAC, ¶¶ 7, 9.) In addition to HSBC, the TAC includes claims against several new defendants: Ocwen Loan Services, LLC ("Ocwen"), Altisource Portfolio Solutions, Inc., Altisource Solutions, Inc., (the "Altisource Defendants") Optimum Property Preservation, LLC ("Optimum"), and IH Professional Services, LLC ("IHPS"). McIntosh is a resident of Illinois, and IHPS is a limited liability company organized under Illinois law, the sole known member of which is an Illinois resident. (*Id.* at ¶¶ 1,6.)[1] The addition of claims against IHPS, then, would destroy diversity.

McIntosh alleges that HSBC used Ocwen to service the mortgage loan, and that Ocwen was responsible for the physical maintenance of the property. (*Id.* at ¶ 11.) Ocwen, in turn, used the Altisource Defendants to perform "property preservation services." (*Id.* at ¶ 12.) The Altisource Defendants hired IHPS to actually provide those services, respond to tenant complaints, and comply with all applicable laws and regulations. (*Id.* at ¶ 13.) IHPS performed this role beginning in September 2010 and until early 2011, when Altisource hired Optimum to provide those services at the property. (*Id.* at ¶¶ 14-15.)

---

[1] McIntosh asserts that she does not know the identity of the constituent members of the Optimum LCC. (TAC, at ¶ 5.)

In early July 2010, McIntosh returned home after being hospitalized for surgery and discovered she had no hot water. (*Id.* at ¶ 16.) As the building was then in foreclosure, she contacted HSBC's attorney, but was told that HSBC was not responsible for fixing utility problems at the building. (*Id.* at ¶ 18.)

Subsequent to the confirmation of sale, McIntosh called "B. Hanson/Bank of America Field Services," the person identified on a notice posted at the property, and complained multiple times about the lack of heat and hot water. (*Id.* at ¶ 20.) After no action was taken, an attorney representing McIntosh sent a letter to HSBC informing it of the lack of heat and hot water at the building and of McIntosh's serious health problems. (*Id.* at ¶ 21.) Again, no action was taken. (*Id.* at ¶ 22.) McIntosh also made numerous calls to the City of Chicago from July 2010 through March 2011, and in August 2010, HSBC and the original landlords were served with an administrative complaint for failure to supply hot water as required by the Chicago Residential Landlord Tenant Ordinance. (*Id.* at ¶ 24.) The original landlords, but not HSBC, were found liable. (*Id.* at ¶ 25.)

McIntosh alleges that on Sept. 29, 2010, IHPS carried out an inspection at the building under the direction of HSBC, Ocwen, and the Altisource defendants. (*Id.* at ¶ 27.) The inspection indicated that the property was occupied and secure, but listed

"NA" in regard to the status of the utilities, and indicated that no maintenance was recommended. (*Id.* at ¶¶ 28-29, *see* Ex. E to TAC.) None of the Defendants took any steps reconnect the utilities. (*Id.* at ¶ 29.)

In January 2011, a city inspector issued a report noting that there was no heat or hot water at the building, and an administrative suit was filed against HSBC in January 2011. (*Id.* at ¶¶ 32-33.) HSBC ultimately was found liable for failing to furnish heat and hot water to the building. (*Id.* at ¶ 35, *see* Ex. H to TAC.) None of the Defendants took any steps to remedy the problem, however, and McIntosh lacked heat and hot water throughout the entire winter of 2010-11. (*Id.* at ¶¶ 36-38.)

McIntosh experienced increased utility bills because she had to use space heaters and her oven to keep her apartment warm. (*Id*. at ¶ 38.) She also suffered physically because she was unable to properly clean her wounds from the surgery, which impaired her ability to heal and caused her permanent injury. (*Id*. at ¶ 42.) McIntosh did not have heat or hot water until late April 2011, after her attorneys obtained a temporary restraining order to restore her heat. (*Id.* at ¶ 45.)

McIntosh contends that IHPS was the party perhaps most directly responsible for negligently maintaining her building because it was IHPS that originally inspected the property for HSBC on Sept. 29, 2010, after the start of the official heat

season in Chicago, and indicated that no maintenance was required. As such, IHPS' participation in this suit is necessary for the sake of efficiency of the parties and the court, she contends.

She also points to HSBC's affirmative defenses, in which it asserted, in relevant part:

> Any injuries, damages, or other violations were the direct and proximate result of the acts, omissions, negligence, fault or breach of persons and/or parties other than HSBC that caused or contributed to cause all, or a portion, of the claimed damages of liability, barring recovery or liability against HSBC in whole or in part. . . . HSBC is not liable for the conduct of third parties. (Dkt. No. 5, at 8.)

HSBC responds that joinder of IHPS is improper because it would destroy diversity jurisdiction, and IHPS is not a necessary party to the suit.

II.

Unfortunately, neither of the parties applies the correct analytical framework to this question. Both address the issue as if it were governed by Fed. R. Civ. P. 19, which deals with joinder of necessary parties. However, in order to permit joinder of a non-diverse party after removal, "it is not necessary that the non-diverse party be one that is indispensable to just adjudication of a lawsuit within the meaning of Rule 19 of the Federal Rules of Civil Procedure." *Destiny Health, Inc. v. Conn. Gen. Life Ins. Co.*, 741 F. Supp. 2d 901, 906 (N.D. Ill. 2010) (internal citations omitted).

Rather, when joinder of a non-diverse party would destroy subject matter jurisdiction, 28 U.S.C. § 1447(e) applies and presents me with two options: (1) deny joinder, or (2) permit joinder and remand the action to state court. *Schur v. L.A. Weight Loss Centers, Inc.*, 577 F.3d 752, 759 (7th Cir. 2009). This, as the Seventh Circuit has noted, is in contrast to the normal rule for pretrial amendment of complaints under Fed. R. Civ. P. 15(a)(2), which provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." *Id.* at 759 n.3.

I have discretion to permit or deny post-removal joinder of a non-diverse party, and must balance the equities to decide. *Id.* (internal citations omitted). In so doing, I should consider: (1) the plaintiff's motive for seeking joinder, particularly whether the purpose is to defeat federal jurisdiction; (2) the timeliness of the request to amend; (3) whether the plaintiff will be significantly injured if joinder is not allowed; and (4) any other relevant equitable considerations. *Id.*

### III.

Although the parties do not directly address the factors outlined in *Schur*, their briefing touches upon them. HSBC contends that McIntosh is seeking to join IHPS in order to

destroy diversity jurisdiction, Def.'s Resp., 3, but does not elaborate on this argument. HSBC also argues that McIntosh knew of the involvement of Optimum and IHPS for more than a year, but did not seek to amend the complaint to add them as defendants until now.

In evaluating whether a plaintiff's motive in seeking to amend a complaint is to defeat diversity jurisdiction, I must look to Illinois law and consider whether there is "any reasonable possibility" that the plaintiff could prevail against the non-diverse party, in this case IHPS. *Schur,* 577 F.3d at 764 (internal citation omitted). McIntosh seeks to add claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence against IHPS. HSBC seems to agree that there are viable potential claims against IHPS, in that it presents no argument as to why McIntosh could not recover against IHPS, but rather contends IHPS and the other proposed new defendants are "permissive parties" under Fed. R. Civ. P. 20 in that relief could be sought from them jointly. Def.'s Resp., 4. Additionally, without analyzing the sufficiency of McIntosh's pleading as to intentional or negligent infliction of emotional distress, there is a reasonable possibility that McIntosh could recover from IHPS for negligence. The *Restatement (Second) of Torts* § 324A imposes a duty of reasonable care on parties such as IHPS who render services for the protection of a

third party, in this case McIntosh. *See UNR Industries, Inc. v. Am. Mut. Liab. Ins. Co.*, 92 B.R. 319, 339 (N.D. Ill. 1988) (explaining the tort of "negligent inspection"). Recovery against IHPS under this theory seems plausible.

Next, I must consider the timeliness of the motion to amend. HSBC contends that Plaintiff has known of the involvement of Optimum and IHPS for a year, but did not seek to amend her complaint to include them until now. In June 2011, McIntosh served her first set of interrogatories, in which she asked HSBC to identify all persons in charge of maintaining or managing McIntosh's building. HSBC responded that Optimum managed the building and offered the name of Jessica Williams, an employee at Optimum. Those interrogatories also inquired about the identity of a woman from Ocwen who approached McIntosh with a "cash for keys" deal that she turned down. HSBC identified that woman as an employee of IHPS and provided a telephone number for that business. (*See* Dkt. No. 24-1.)

McIntosh maintains that she discovered IHPS' role in maintaining her building only recently. In written discovery responses tendered on June 5, 2012, HSBC and Ocwen said that Ocwen contracts with Altisource to maintain the properties owned by former mortgagees, and listed Optimum and IHPS as "agents, contractors, [or] subcontractors" of Ocwen who performed maintenance at McIntosh's building. (*See* Dkt. No. 20-3.)

8

On June 7, 2012, McIntosh's attorney took the deposition of Paul Myers, a loan analyst for Ocwen and HSBC's designated Rule 30(b)(6) representative. Myers testified that Ocwen hired Altisource, who then hired IHPS and, subsequently, Optimum, to manage the property. (*See* Dkt. No. 20-4, at 17–18.) Myers also testified that plaintiff's injuries could have been caused by the previous owner of the property, or by a vendor such as IHPS. (*Id.* at 38.)

Based on the materials submitted by the parties, McIntosh's request to amend her complaint is timely. Although she was given IHPS' name as an entity involved with the property about a year ago, its role in maintaining the premises did not become clear until recently, and McIntosh moved to amend at that time.

As for whether the denial of the motion could prejudice McIntosh, HSBC admits that Ocwen, Altisource, IHPS, and Optimum are permissive parties. It would be inefficient, and could result in inconsistent results, to require McIntosh to pursue claims against IHPS in a separate state court proceeding simply because it would destroy diversity to add IHPS as a defendant in this matter. *See Destiny Health, Inc.*, 741 F. Supp. 2d at 910. HSBC presents no argument as to how it would be prejudiced by this matter proceeding in state court, and given that all of the claims arise under Illinois law or the Chicago Residential

Landlord Tenant Ordinance, the state court is well-equipped to handle this matter.

IV.

For the reasons provided, Plaintiff's Motion for Leave to File Third Amended Complaint Adding New Parties and to Remand to State Court (Dkt. No. 20) is granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: July 23, 2012